USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 97-1345 MIGUEL MALDONADO, ET AL., Plaintiffs - Appellants, v. RAMON DOMINGUEZ, ET AL., Defendants - Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Jos Antonio Fust , U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Cyr, Senior Circuit Judge, ____________________ and DiClerico, Jr.,* District Judge. ______________ _____________________ Hilda Surillo-Pe a, with whom Jaime Sifre-Rodr guez, Luis A. __________________ _____________________ _______ Mel ndez-Albizu and S nchez-Betances & Sifre were on brief for _______________ _________________________ appellants. Jorge P rez-D az, with whom Pietrantoni M ndez & Alvarez was ________________ ____________________________ on brief for Dean Witter Reynolds, Inc. Amanda Acevedo-Rhodes, with whom Luz Ivette Rivera and Luz _____________________ _________________ ___ Ivette Rivera & Asociados were on brief for appellee Ram n ____________________________ Dom nguez. ____________________ February 27, 1998 ____________________  ____________________ * Of the District of New Hampshire, sitting by designation. TORRUELLA, Chief Judge. Plaintiffs invested in and TORRUELLA, Chief Judge. ___________ became directors of a corporation called the Puerto Rico International Bank ("PRIBANK"), which was designed to create huge profits for its investor-directors by leveraging its collateral with low interest loans in order to purchase higher interest mortgage obligations. When PRIBANK failed, the plaintiffs brought this suit, claiming that the investment bankers marketing the PRIBANK stock defrauded them by failing to mention the possibility that PRIBANK's securities would be "called" in the event of an interest rate adjustment. The investors filed this suit under sections 12(2) and 17(a) of the Securities Act of 1933, 15 U.S.C. 77l, 77q, as well as section 10(b) of the Securities Act of 1934, 15 U.S.C. 78j, and Rule 10(b)(5) of the Securities and Exchange Commission ("SEC") promulgated thereunder. The district court dismissed all of these claims on a motion to dismiss. We affirm. BACKGROUND BACKGROUND __________ In addressing a 12(b)(6) motion, we must accept all well-pleaded facts as true and accord the plaintiff the benefit of all reasonable inferences. See LeBlanc v. Great Am. Ins. Co., ___ _______ __________________ 6 F.3d 836, 841 (1st Cir. 1993). The following recitation of this case's background reflects this standard.  Plaintiffs Miguel Maldonado, et al. -- important clients of Dean Witter Reynolds, Inc. of Puerto Rico ("Dean Witter") -- received mailed invitations to a meeting at an exclusive San Juan club where they would be presented with a -2- select investment opportunity. At the August 30, 1993 meeting, Ram n Dom nguez, Senior Vice-President and Sales Manager of Dean Witter, made a presentation regarding the formation of PRIBANK, a new corporation. He explained PRIBANK's investment philosophy, and stated that individual investors' participation would be limited to ten blocks of $350,000, with an additional $1.5 million coming from himself and Antonio Luis Rosado -- Vice President of Santander National Bank, and president-to-be of PRIBANK. Each investor would become a director of the corporation. According to Dom nguez, PRIBANK was a virtually risk-free investment which was projected to return 176% of the investors' principal in only two years.  PRIBANK's strategy was relatively simple. PRIBANK would use $5 million of collateral to open margin accounts of almost $300 million with various brokerage houses. PRIBANK would be permitted to leverage itself through these brokerage houses for 60 times its capital because it had the credit of Dean Witter to back it up and because funds provided to PRIBANK on its margin accounts were not allowed to be used for the purchase of credit risk assets. In other words, PRIBANK would be seen by the brokerage houses as a safe entity because its investments would be low risk and its credit with Dean Witter was trusted. The money in PRIBANK's margin accounts would be used to purchase Real Estate Mortgage Investment Conduits ("REMICs") and Collateralized Mortgage Obligations ("CMOs"), effectively making PRIBANK the lender for numerous home mortgages. These REMICs and -3- CMOs would pay interest to PRIBANK at a higher rate than PRIBANK was required to pay to the brokerage houses for the money in its margin accounts. The difference between the low interest rate PRIBANK would be paying and the higher interest rate PRIBANK would be collecting -- the "spread" -- would be PRIBANK's profit. Since PRIBANK was able to borrow approximately 60 times more than its collateral, a spread of only 1 percent would have resulted in huge profits for PRIBANK's investors. A further property of PRIBANK's investment structure made it unique. PRIBANK would only purchase investments called "floaters," which would be re-priced and adjusted for prevailing interest rates every thirty days. Every thirty days, PRIBANK would collect interest on these investments. PRIBANK planned to carefully structure its investments so that each month, on the same day that interest payments were due to the brokerage houses, PRIBANK would also collect interest on its investments. Dom nguez labelled this as "matching." This would give PRIBANK an advantage over normal financial institutions which purchased floating REMICS and CMOs without this perfect matching. Normal financial institutions _______ have mismatched inventories, and have to keep reserves on hand to account for withdrawals and to pay obligations when they come due. The higher interest rates these institutions make on their loans barely make up for the potential interest lost on the money sitting in their reserves at any given time. However, due to its perfect matching, PRIBANK would not be required to keep any -4- significant reserves on hand, and could invest all of its money every month, enabling it to take full advantage of the spread in interest rates. Therein lay the key to PRIBANK's philosophy, and eventually to its downfall. Dom nguez explained that PRIBANK's goal was to make money based upon the interest rate spread, and yet insulate itself from any changes in interest rates. Whether rates went up or down, the spread would always remain. What Dom nguez failed to explain to the investors was that PRIBANK was not a risk-free, or even a low-risk investment. Instead, PRIBANK would be engaged in highly leveraged margin trading, and, like any margin trader, PRIBANK's investments could be subject to "margin calls." That is, if interest rates went up, the value of REMICs and CMOs (and other loan obligations) would go down, and brokerage houses could require investors to put up more collateral to cover the paper loss. Margin calls do not necessarily occur on the same day that investments are adjusted and repriced -- at the 30-day mark in PRIBANK's case -- but can occur at any time after the value of the investments falls. PRIBANK, which was designed to profit by having no reserves, would not be able to cover any margin calls. Therefore, any significant hike in interest rates could bankrupt PRIBANK, and its investors would lose their investments. This significant risk was not disclosed to investors at the August 30, 1993 meeting. Instead, investors were told that fluctuating interest rates would pose no threat to PRIBANK's profitability. The investors believed that Dom nguez and Rosado -5- had struck upon a scheme whereby they could make huge profits for little or no risk. They invested $350,000 each in exchange for a 5.5% share of PRIBANK and a seat on the board. Dom nguez and Rosado made commissions on this $3.5 million of investments. PRIBANK began operations in January 1994. On February 4, 1994, the Federal Reserve increased interest rates by 1/4 point. This increase was the first of several increases which were to occur in future weeks. Brokerage houses soon began to make margin calls. To meet the margin calls, PRIBANK was required to sell investments before their agreed-upon settlement dates, resulting in significant penalties. As one margin call was being paid off, another loan would be called, and PRIBANK would scramble to sell another investment, incurring more penalties, and draining PRIBANK's original $5 million collateral. In the midst of this collapse, on February 23, 1994, PRIBANK held a meeting of the board. At the meeting, Dom nguez presented a picture of a smoothly-running operation, pointing out promising investments that PRIBANK was looking into and failing to mention the fact that PRIBANK was already experiencing margin calls and sustaining losses. Soon after this meeting, PRIBANK lost its remaining assets and its stock became worthless. The present suit was brought before the District Court of Puerto Rico under the Securities Act of 1933, 15 U.S.C. 77 (the "1933 Act" or "Securities Act"), and the Securities Act of 1934, 15 U.S.C. 78 (the "1934 Act" or "Exchange Act"). -6- Plaintiffs allege that fraudulent statements and omissions were made by Dom nguez and Rosado, and further allege vicarious liability on the part of Dean Witter. The district court dismissed all claims on Rule 12(b)(6) motions. This appeal followed. On appeal, plaintiffs make a number of claims. First, they argue that, to the extent that the district court converted any of the Rule 12(b)(6) motions into motions for summary judgment under Rule 56(c), plaintiffs received inadequate notice and opportunity to submit evidence. At issue is both whether such a conversion actually occurred and whether a conversion would have been appropriate at that stage of the case. Plaintiffs next claim that the district court erred in finding that there is no implied private cause of action under section 17(a) of the 1933 Act. Plaintiffs urge this court to recognize such a cause of action. Plaintiffs further contend that the district court erred in concluding that PRIBANK stock was privately offered. The character of PRIBANK's offering became material to the case when, shortly after this complaint was filed, the Supreme Court decided Gustafson v. Alloyd Co., 513 U.S. 561, 577-78 (1995), _________ ___________ holding that section 12(2) of the 1933 Act did not apply to private offerings. Next, plaintiffs argue that their claim under section 10(b) of the 1934 Act -- and Rule 10b-5 of the Securities and Exchange Commission promulgated thereunder -- was pled with -7- sufficient particularity. Specifically, they contest the district court's ruling that they had failed to plead specific facts which create a triable question on the issue of defendants' "scienter." -8- Finally, plaintiffs claim that the district court abused its discretion in denying their request for leave to file an amended complaint after the district court entered judgment. The argument stems from the district court's issuance of a margin order which indicated that this seemingly tardy request for leave would be granted. We address these arguments in turn. ANALYSIS ANALYSIS ________ I. Conversion of 12(b)(6) Motions I. Conversion of 12(b)(6) Motions Plaintiffs allege that the district court improperly converted the series of 12(b)(6) motions at issue into motions for summary judgment pursuant to Fed. R. Civ. P. 56(c). Plaintiffs argue that such a conversion is necessarily improper where defendants have offered no materials outside the pleadings and where the court has not given express notice of its intent to convert the motions. As a matter of law, plaintiffs are correct. However, a close reading of the district court opinion reveals that the court dismissed these claims based solely on the insufficiency of the pleadings, and we affirm on those grounds. In Moody v. Town of Weymouth, 805 F.2d 30, 31 (1st Cir. _____ ________________ 1986), we held that when a district court fails to give express notice to the parties of its intention to convert a 12(b)(6) motion into a motion for summary judgment, there is no reversible error if the party opposing the motion (1) has received materials outside the pleadings, (2) has had an opportunity to respond to them, and (3) has not controverted their accuracy. The Moody _____ "exception" to the rule that the district court must notify the -9- parties of an intent to convert motions is limited, and unless the three factors listed above are present the exception does not apply. See Cooperativa de Ahorro y Cr dito Aguada v. Kidder, ___ ________________________________________ _______ Peabody & Co., 993 F.2d 269, 273 (1st Cir. 1993) (in deciding a ______________ 12(b)(6) motion, a district court normally must either ignore extraneous materials or give the parties notice and an opportunity to respond to the conversion to a summary judgment motion). In the present case, the plaintiffs filed a detailed pleading with several documentary exhibits. Defendants argue that this fact alone put plaintiffs on notice that any 12(b)(6) motion could be converted into a 56(c) motion for summary judgment. This argument fundamentally misinterprets Moody and _____ therefore fails. Plaintiffs were therefore surprised to find that the district court had converted the motions. Throughout its opinion, the district court used language consistent with an award of summary judgment, ruling that "Plaintiffs have failed to adduce sufficient evidence to create a material issue of fact." However, an opinion's plain language does not always mirror its plain logic, and while a quick perusal of the opinion might lead one to believe that the district court had applied the wrong standard of decision, looking past the terminology employed by the court reveals an opinion illustrating the legal insufficiency of the pleadings for each claim in this suit. See Garita Hotel ___ ____________ Ltd. Partnership v. Ponce Fed. Bank, F.S.B., 958 F.2d 15, 18 (1st ________________ _______________________ Cir. 1992) (the determination of whether a district court has -10- converted a 12(b)(6) motion is "functional rather than mechanical"). On that basis, we affirm the standard of decision actually employed by the district court, and we now examine each of the district court's rulings regarding the insufficiency of the pleadings in this case. II. Section 17(a) of the 1933 Act II. Section 17(a) of the 1933 Act The district court dismissed one of the plaintiffs' claims after concluding that there was no implied private cause of action under section 17(a) of the 1933 Act. We agree. Section 17 of the 1933 Act provides that: It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by theuse of the mails, directly or indirectly -  (1) to employ any device, scheme, or artifice to defraud, or  (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or  (3) to engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon the purchaser. 15 U.S.C. 77(q). Courts and law enforcement agencies have the authority to enforce section 17(a) of the 1933 Act via injunction and criminal prosecution. However, for years circuit courts have struggled with the question of whether an implied private right of action to enforce section 17(a) also exists. The Supreme Court has never answered the question. See Bateman Eichler, Hill ___ _____________________ -11- Richards, Inc. v. Berner, 472 U.S. 299, 304 n.9 (1985). Until ______________ ______ today, neither had this court. See Cleary v. Perfectune, Inc., ___ ______ ________________ 700 F.2d774, 779 (1stCir. 1983)(declining to reachthis question). This issue has caused confusion because, while neither the language nor the history of section 17(a) clearly indicates a congressional intent to create a private right of action, see ___ Newcome v. Esrey, 862 F.2d 1099, 1103-07 (4th Cir. 1988), section _______ _____ 10(b) of the 1934 Act -- with substantially similar language -- has always been interpreted to provide for a private right of action. See Herman & MacLean v. Huddleston, 459 U.S. 385-87 ___ __________________ __________ (1983) (expressly interpreting section 10(b)'s private right of action as consistent with securities laws' "broad remedial purposes"). While some courts did not find the requisite congressional intent to infer a private right of action from section 17(a), see Touche Ross & Co. v. Redington, 442 U.S. 560, ___ _________________ _________ 574-76 (1979) (legislative intent is the primary factor to consider when addressing whether a private right of action exists), other circuits found no meaningful distinction between section 17(a) and section 10(b). Compare Daniel v. Teamsters, _______ ______ _________ 561 F.2d 1223, 1244-46 (7th Cir. 1977) (holding that a private right of action exists), and SEC v. Texas Gulf Sulphur Co., 401 ___ ___ _______________________ F.2d 833, 867 (2d Cir. 1968) (Friendly, J., concurring) (same), with Landry v. All Am. Assur. Co., 688 F.2d 381, 384-91 (5th Cir. ____ ______ __________________ 1982) (holding that no private right of action exists), and ___ Stephenson v. Calpine Conifers II, Ltd., 652 F.2d 808, 815 (9th __________ __________________________ Cir. 1981) (same). -12- However, in Aaron v. SEC, 446 U.S. 680, 695-97 (1980), _____ ___ the Supreme Court held that, unlike section 10(b) of the Exchange Act, section 17(a) of the Securities Act does not require proof of scienter. Thus, while the implied cause of action under 10(b) would expose only the deceitful to private causes of action, an implied cause of action under 17(a) would impose such liability on merely negligent wrongdoers. Furthermore, the Court had ruled four years earlier that a judicially created cause of action, such as the one implied under section 10(b), could not be extended to actions premised on negligent wrongdoing. See Ernst ___ _____ & Ernst v. Hochfelder, 425 U.S. 185, 210 (1976). _______ __________ Aaron and Ernst highlighted for courts a significant _____ _____ distinction between implying private causes of action under the two sections. While the 10(b) implied cause of action has continued to enjoy unanimous recognition and the imprimatur of a unanimous Supreme Court in Huddleston, the 17(a) cause of action __________ has been held up to renewed scrutiny. In recent years, every circuit to have addressed the issue has refused to recognize a private right of action under section 17(a), including four circuits which originally had held otherwise. See Finkel v. ___ ______ Stratton Corp., 962 F.2d 169, 174-75 (2d Cir. 1992) (noting that ______________ Kirshner v. United States, 603 F.2d 234 (2d Cir. 1978), had been ________ _____________ overruled); Newcome v. Esrey, 862 F.2d 1099, 1101-07 (4th Cir. _______ _____ 1988) (overruling Newman v. Prior, 518 F.2d 97 (4th Cir. 1975)); ______ _____ Stephenson v. Paine Webber Jackson & Curtis, Inc., 839 F.2d 1095, __________ ___________________________________ 1100 (5th Cir.); Schlifke v. Seafirst Corp., 866 F.2d 935, 942-43 ________ ______________ -13- (7th Cir. 1989)(overruling Daniel v. Teamsters, 561 F.2d 1223 ______ _________ (7th Cir. 1977), rev'd on other grounds, 439 U.S. 551 (1979)); _______________________ Deviries v. Prudential-Bache Sec., Inc., 805 F.2d 326, 328 (8th ________ ___________________________ Cir. 1986); Puchall v. Houghton, Cluck, Coughlin & Riley (In re _______ __________________________________ _____ Washington Pub. Power Supply Sys. Sec. Litig.), 823 F.2d 1349, _______________________________________________ 1350 (9th Cir. 1987) (overruling Mosher v. Kane, 784 F.2d 1385 ______ ____ (9th Cir. 1986); Stephenson v. Calpine Conifers II, Ltd., 652 __________ __________________________ F.2d 808, 815 (9th Cir. 1981)); Zink v. Merrill Lynch Pierce ____ _____________________ Fenner & Smith, Inc., 13 F.3d 330, 334 (10th Cir. 1993); Currie ____________________ ______ v. Cayman Resources Corp., 835 F.2d 780, 784-85 (11th Cir. 1988). ______________________ We now come to the same conclusion. In determining whether an implied private right of action exists in a statute, we look to congressional intent, see ___ Touche Ross, 442 U.S. at 574-76, keeping in mind that there is a ___________ strong presumption against such inferences. See Sterling Suffolk ___ ________________ Racecourse v. Burrellville Racing, 989 F.2d 1266, 1268 (1st Cir. __________ ___________________ 1993). In this case, we do not find sufficient evidence of congressional intent to overcome the presumption. As the district court observed, Congress explicitly provided for private __________ causes of action in sections 11 and 12 of the 1933 Act. While the fact that other provisions of a complex statutory scheme create express remedies does not in itself prove that Congress did not imply a private remedy in another section, see Cannon v. ___ ______ University of Chicago, 441 U.S. 677, 690 n.13 (1979), where the _____________________ explicit remedies in the same statute address much of the same conduct and benefit the same parties as a potential implied -14- private cause of action, the circumstances militate against that inference. Furthermore, the legislative history of section 17(a) does not, on the whole, favor an implied private right of action. See Newcome, 862 F.2d at 1103-07 (conducting an in-depth ___ _______ examination of the legislative history of this provision). Therefore, the district court did not err in dismissing the plaintiffs' claim under section 17(a) of the 1933 Act. III. Section 12(2) of the 1933 Act III. Section 12(2) of the 1933 Act Plaintiffs also brought suit under section 12(2) of the Securities Act. This provision establishes civil liability for any person who uses fraudulent means to sell a security.1  ____________________ 1 According to 15 U.S.C. 77l(a)(2): Any person who . . . offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, upon the tender of such security, or for damages if he no longer owns the security. -15- However, after the complaint was filed in this case, the Supreme Court conclusively decided that section 12(2) applies exclusively to "initial public offerings." See Gustafson v. Alloyd Co., 513 ___ _________ __________ U.S. 561, 577-78 (1995). The district court, ruling that the pleadings established that PRIBANK stock had been placed privately, dismissed the 12(2) claim. Plaintiffs appeal this _________ ruling, arguing that their pleadings did not admit that PRIBANK stock was placed privately. Since Gustafson was decided after _________ their complaint was filed, the plaintiffs argue that they should have received permission to amend their complaint, which currently fails to explicitly address whether PRIBANK's stock was placed privately or publicly. Therefore, the question for this court to decide is whether the pleadings, in their current form, establish that PRIBANK's stock was placed privately. A placement of stock is private if it is offered only to a few sophisticated purchasers who each have a relationship with the issuer, enabling them to command access to information that would otherwise be contained in a registration statement. See Cook v. Avien, Inc., 573 F.2d 685, 691 (1st Cir. 1978). "The ___ ____ ___________ determination of whether an offer is not public has not been relegated to a simple numerical test." See Van Dyke v. Coburn ___ ________ ______ Enters, Inc., 873 F.2d 1094 (8th Cir. 1989) (citing SEC v. _____________ ___ Ralston Purina Co., 346 U.S. 119, 125 (1953)). Instead, courts __________________ are required to weigh the facts of each case carefully to assess whether the offerees need to be protected under the 1933 Act. See Ralston Purina, 346 U.S. at 127. ___ ______________ -16- In this case, twelve invitations were sent to Dean Witter clients. Dom nguez had personally managed accounts in the past for each of them. The plaintiffs were not merely asked passively to invest in an existing entity, but to partner in starting a new corporation. Each shareholder of PRIBANK bought a 5.5% interest in the corporation and a seat on the board of directors. The board was to meet each month, and according to PRIBANK's by-laws the board of directors had full control and direction of the corporation's affairs and business. Section 12(2) of the 1933 Act protects those investors who would otherwise be powerless against fraudulent offers of securities. When a select group of investors are asked to become directors of a new corporation, and have access to all documents relevant to the corporation's formation and investments, they cannot bring suit under section 12(2) when the corporation fails for the reasons claimed in this suit. Let us be clear. We do not mean to suggest that a director has no remedy when defrauded by others within a new corporation, but only that, under Gustafson, section 12(2) of the 1933 Act is not available to this _________ class of claimants. Under these circumstances, there was no need to allow leave to amend the pleadings on this issue. We therefore affirm the district court's dismissal of this claim under Rule 12(b)(6).2  ____________________ 2 Plaintiffs maintain that Dom nguez' statements could form the basis of section 12(2) claims in spite of the fact that they did not appear in the prospectus, because section 12(2) applies more broadly to initial public offerings which are exempted from SEC registration -- in this case due to the "intrastate" character of -17- IV. Section 10(b) of the 1934 Act (SEC Rule 10b-5) IV. Section 10(b) of the 1934 Act (SEC Rule 10b-5) Plaintiffs also seek relief under section 10(b) of the Exchange Act, 15 U.S.C. 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. 240.10b-5, which prohibit any person, directly or indirectly, from committing fraud in connection with the purchase or sale of securities. See id.; Gross v. Summa ___ ___ _____ _____ Four, Inc., 93 F.3d 987, 992 (1st Cir. 1996).3 Unlike section __________ 17(a), section 10(b) requires that plaintiffs plead -- with sufficient particularity to withstand Fed. R. Civ. P. 9(b) -- that defendants acted with "scienter." Scienter has been defined as "a mental state embracing intent to deceive, manipulate, or defraud." See Ernst, 425 U.S. at 193 n.12. Plaintiffs allege ___ _____ that Dom nguez and Rosado understood and concealed the risks of margin calls on the PRIBANK investments.  This circuit has been clear and consistent in holding  ____________________ PRIBANK's offering. By concluding that PRIBANK's stock was placed privately, we need not reach this issue. 3 Under section 10(b) of the 1934 Act: It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange-- (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors. 15 U.S.C. 78j. -18- that, under section 10(b), plaintiffs must plead specific facts giving rise to a "strong inference" of fraudulent intent. See ___ Greenstone v. Cambex Corp., 975 F.2d 22, 25 (1st Cir. 1992).4 __________ ____________ "Courts have uniformly held inadequate a complaint's general averment of the defendant's 'knowledge' of material falsity unless the complaint also sets forth specific facts that make it reasonable to believe that defendant knew that a statement was false or misleading." Id. Applying this standard to plaintiffs' ___ complaint, the district court dismissed the claim for failure to plead scienter with sufficient particularity.5 "This court has been 'especially rigorous' in applying Rule 9(b) in securities fraud actions 'to minimize the chance that a plaintiff with a largely groundless claim will bring a suit and conduct extensive discovery in the hopes of obtaining an increased settlement, rather than in the hopes that the process will reveal relevant evidence.'" Shaw v. Digital Equip. Corp., ____ _____________________ 82 F.3d 1194, 1223 (1st Cir. 1996) (quoting Romani v. Shearson, ______ _________  ____________________ 4 Even if plaintiffs wish to prove scienter by "recklessness," they still must allege, with sufficient particularity, that defendants had full knowledge of the dangers of their course of action and chose not to disclose those dangers to investors. See ___ Cook, 573 F.2d at 692. ____ 5 In December 1995, citing "abuse in private securities lawsuits," Congress enacted the Private Securities Litigation Reform Act of 1995 (the "Reform Act"). 15 U.S.C. 78u-4 (1988 & Supp. 1995). This Act implemented a "heightened" pleading standard under federal securities law which requires that factual allegations be of sufficient particularity to give rise to a strong inference that the defendant acted with the requisite state of mind. 15 U.S.C. 78u-4(b)(1). Although the Reform Act does not retroactively apply to this case, we do not interpret the new standard to differ from that which this court has historically applied. See Greenstone, 975 F.2d at 22. ___ __________ -19- Lehman, Hutton, 929 F.2d 875, 878 (1st Cir. 1991)). However, in ______________ examining a complaint for the requisite particularity in allegations of fraud, we are required to apply a delicate standard. While Fed. R. Civ. P. 9(b) proscribes the pleading of "fraud by hindsight," we also cannot expect plaintiffs to plead "fraud with complete insight" before discovery is complete. Id. ___ at 1225. We therefore look carefully for specific allegations of fact giving rise to a "strong inference" of fraudulent intent, see Greenstone, 975 F.2d at 25, keeping in mind that the pleading ___ __________ of scienter "may not rest on a bare inference that a defendant 'must have had' knowledge of the facts." Id. at 26 (quoting ___ Barker v. Henderson, Franklin, Starnes & Holt, 797 F.2d 490, 497 ______ ____________________________________ (7th Cir. 1986)).6  The plaintiffs' brief argues that Dom nguez and Rosado  ____________________ 6 Plaintiffs urge this court to adopt a new means for testing whether scienter has been properly pled in 10(b) claims. According to plaintiffs, the Second Circuit's "motive and opportunity" test properly screens out those claims which lack the requisite specificity to proceed with discovery. See, e.g., ___ ____ Chill v. General Elec. Co., 101 F.3d 263, 267 (2d Cir. 1996) _____ __________________ (determining whether defendants had the motive and opportunity to commit fraud); Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, _______ ________________________ 1128 (2d. Cir. 1994) (same). It is unclear whether this test is compatible with this circuit's "especially rigorous" application of Rule 9(b) in the securities fraud context. In any case, this court has had the opportunity to develop a framework for analyzing the sufficiency of pleadings in cases similar to the present one, and we respectfully decline the invitation to review or adopt Second Circuit case law on this issue. Cf. Bruce G. ___ Vanyo, Lloyd Winawer & David Priebe, The Pleading Standard of the ____________________________ Private Securities Litigation Reform Act of 1995, PLI Corp. Law & ________________________________________________ Practice Course Handbook Series, Sept. 1997, 71-81, available in Westlaw at 1015 PLI/Corp. 71 (chronicling how Congress expressly rejected the Second Circuit's "motive and opportunity" test for pleading scienter in the Reform Act because it was incompatible with the Act's heightened pleading requirements).  -20- were "persons highly knowledgeable and with much expertise in the field of securities and investments of the type purchased by PRIBANK." However, the complaint dismissed by the district court paints a somewhat different picture. According to the complaint, although both Dom nguez and Rosado were vice-presidents of large financial institutions, "neither one of them had engaged in a REPO transaction on behalf of any bank with assets similar to those of PRIBANK, and had no manner to assure that what they represented to plaintiffs and the other investors was true." Given 10(b)'s requirement of a pleading of scienter, ________ characterizing the defendants as irresponsible or "in over their heads" does not further the plaintiffs' cause.  The complaint is also replete with allegations based on "information and belief" that Dom nguez and Rosado were aware of the risk of margin calls. However, "information and belief" alone is insufficient to meet 9(b)'s particularity requirement in this context. See Romani v. Shearson, Lehman, Hutton, 929 F.2d ___ ______ _________________________ 875, 878 (1st Cir. 1991).  When we examine these pleadings carefully, we find that there are no specific allegations of fact which strongly imply a fraudulent intent. At most, the complaint contains general inferences that Dom nguez and Rosado "must have known" about the risks of margin calls and the devastating effect they could have on PRIBANK. Unfortunately for the plaintiffs, these are precisely the types of inferences which this court, on numerous occasions, has determined to be inadequate to withstand Rule 9(b) -21- scrutiny. See Shaw, 82 F.3d at 1123; Serabian v. Amoskeag Bank ___ ____ ________ _____________ Shares, 24 F.3d 357, 367 (1st Cir. 1994); Greenstone, 975 F.2d at ______ __________ 26; Romani, 929 F.2d at 878.7 ______ V. Leave to Amend the Complaint V. Leave to Amend the Complaint After the district court's opinion issued in this case, the plaintiffs filed a motion for leave to amend the pleadings. The court denied this motion. However, before ruling on defendants' motions to dismiss, the district court had issued a perplexing margin order amending this case's briefing schedule. According to the margin order, any motion requesting leave to amend pleadings and amended pleadings could be filed ten days after the court resolved all "pending pleadings." While the meaning of the phrase "pending pleadings" is unclear, plaintiffs argue that the phrase referred to the pending motions to dismiss, and that the denial of their subsequent request for leave to amend was therefore an abuse of discretion.8   ____________________ 7 The complaint contains additional allegations that Dom nguez and Rosado knew that PRIBANK was disintegrating at the same time that they presented a rosy picture to investors at the February board meeting. However, these allegations involve activity occurring well after the original sale of PRIBANK stock, and are therefore immaterial for the purposes of this 10(b) cause of action. See Gross, 93 F.3d at 993 (citing Shaw, 82 F.3d at 1222, ___ _____ ____ for the proposition that allegations of conduct occurring after sale or exchange at issue in 10(b) claim are irrelevant). Even if the allegations are true, the fact that Dom nguez and Rosado had discovered PRIBANK's fatal flaw before the February board meeting is not probative of any attempt to defraud the plaintiffs months earlier.  8 We note that a motion to dismiss is not a "pleading" as the term is defined in Fed. R. Civ. P. 7. Furthermore, the order does not promise to grant any motions filed after the resolution _____ of "pending pleadings," but instead states that such requests and pleadings may be filed. Nonetheless, we believe that plaintiffs' _____ -22- Looking at the order itself does not resolve our uncertainty about its interpretation. The motion that was granted via margin order was five pages long. It was entitled "Plaintiffs' Objections and Proposed Changes to Scheduling Order" and generally consisted of very ordinary requests for extensions of time. Buried on the third page, however, was a short paragraph containing the vague and confusing language sampled above, which could be interpreted as a request for a highly unconventional scheduling change. When the district court judge granted the motion, he did so by writing "granted" in the left margin of the first page, as is customary in district courts. It is entirely possible that the judge was unaware of the unusual and arguably improper request that he was supposedly granting along with the standard extensions contained in the motion. However, while the motion filed by the plaintiffs was unclear, it could not be fairly characterized as deceptive. Since no motion to reconsider this margin order was filed, and no clarification or amendment to the order issued from the court, we must give the order its reasonable construction.  This court is asked to determine the meaning, propriety, and effect of the margin order. Depending upon the interpretation of the motion, two bedrock principles of civil procedure may conflict in this case. On the one hand, a district court cannot allow an amended pleading where a final judgment has  ____________________ interpretation of the order as a blank check to rewrite the complaint after the case has been dismissed is not entirely implausible. -23- been rendered unless that judgment is first set aside or vacated pursuant to Fed. R. Civ. P. 59 or 60. See Acevedo-Villalobos v. ___ __________________ Hern ndez, 22 F.3d 384, 389 (1st Cir. 1994). On the other hand, _________ the district court's scheduling order purportedly allowed plaintiffs just such a luxury, and, if it did, they were entitled to rely on that order. See Berkovitz v. Home Box Office, Inc., ___ _________ ______________________ 89 F.3d 24, 29-30 (1st Cir. 1996) ("[W]hen a court charts a procedural route, lawyers and litigants are entitled to rely on it."). -24- Under these circumstances, we are keenly interested in the district court's interpretation of its own order. On review, we cannot hope to understand the nuances of a district court's briefing schedule as completely as the judge who managed the case. There may well have been comments made in scheduling conferences which clarified the order. Unfortunately, the plaintiffs never raised this issue below. Plaintiffs' request for leave to amend was part of its motion to reconsider the dismissal of its claims, and it contained no mention of the margin order or plaintiffs' understanding that they had been promised a leave to amend. This failure to raise the issue before the district court is fatal to the claim on appeal. See ___ Villafa e-Neriz v. F.D.I.C., 75 F.3d 727, 734 (1st Cir. 1996). _______________ ________ We must be especially vigilant in applying this rule where the dispute involves an understanding reached by the parties and the district court during the pre-trial stages of a case. In any case, we need not remand this case to allow for a revision of the complaint because the amendments proposed by the plaintiffs would be futile. See Foman v. Davis, 371 U.S. 178 ___ _____ _____ (1962) (leave to amend shall not be granted where amendments would be futile); Resolution Trust Corp. v. Gold, 30 F.3d 251, _______________________ ____ 253 (1st Cir. 1994) (same). In their request for leave to amend, and again before this court, plaintiffs allude to the factual allegations which they would incorporate into an amended complaint, producing detailed documentary evidence for support. Nonetheless, a careful review of this material reveals that these -25- amended claims would be destined for dismissal. There exists no private right of action under section 17(a) of the 1933 Act, and section 12(2) of the Act does not apply to the issuance of securities under the circumstances presented by this case. See supra Sections II & III. No further ___ _____ factual allegations can save these claims. Furthermore, while the 10(b) action could survive dismissal if plaintiffs could provide more specific allegations of fact which strongly imply a fraudulent intent on the part of Dom nguez and Rosado, the proposed amendments to the complaint would not do so. Plaintiffs provide an expert's affidavit concluding that defendants would have known of the likelihood that their securities would be subject to margin calls, and the devastating effect that this would have on PRIBANK. Yet, as we have stated, the pleading of scienter "may not rest on a bare inference that a defendant 'must have had' knowledge of the facts." Greenstone, 975 F.2d at 26 __________ (quoting Barker, 797 F.2d at 497).9 We conclude that the amended ______ 10(b) claim would not have passed 9(b) scrutiny.10  ____________________ 9 Furthermore, this affidavit, along with plaintiffs' other documentary evidence in support of their request for leave to amend, indicates that Dom nguez and Rosado invested and lost one and a half million dollars of their own money in PRIBANK, which __________________ undermines any inference of scienter.  10 Plaintiffs also argue that they filed requests for leave to amend their complaint prior to the resolution of the motions to _____ dismiss. We find that these "motions" were never actually filed. Instead, the plaintiffs, in other filings, merely mentioned that, at some point, they would seek leave to amend. That leave was not sought until after the case was dismissed. In any case, the issue is mooted by our finding that amending the complaint would be futile. -26- CONCLUSION CONCLUSION __________ For the reasons stated in this opinion, we affirm the affirm ______ judgment of the district court. -27-