John **MORTENSEN**, et al., Plaintiffs,

v.

**AMERICREDIT CORP.,**
et al., Defendants.

No. CIV. A. 3:99–CV–0789.

United States District Court,
N.D. Texas,
Dallas Division.

April 21, 2000.

Brian Murray, Rabin & Peckel, New York City, NY, Thomas M. Melsheimer, Nancy Horton Burke, Fish & Richardson, Dallas, TX, for plaintiffs.

Stephen S. Maris, Jenkens & Gilchrist, Dallas, TX, for defendants.

1. Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4.

## MEMORANDUM OPINION AND ORDER

FITZWATER, District Judge.

This securities fraud action follows defendant AmeriCredit Corporation's ("AmeriCredit's") decision to restate certain financial results to calculate earnings using the cash-out rather than the cash-in method under Financial Accounting Standards Board Statement No. 125 ("FASB No. 125") for valuing credit enhancement assets after the Securities and Exchange Commission ("SEC") clarified that the cash-in method was not acceptable. Defendants move to dismiss, contending *inter alia* that plaintiffs have failed to plead scienter in the manner required by Fed. R.Civ.P. 9(b) and 12(b)(6) and the PSLRA.[1] Because the court agrees that plaintiffs have failed adequately to plead scienter, and since it has already given plaintiffs a second opportunity to do so, the court grants the motion and dismisses this action with prejudice.

I

AmeriCredit common stock is actively traded on the New York Stock Exchange with approximately 62 million shares outstanding. AmeriCredit's primary business is purchasing, securitizing, and servicing automobile receivables. AmeriCredit buys receivables from automobile dealerships and sells them to special purpose vehicles ("SPVs") known as financing securitization trusts. The SPVs raise capital to purchase the receivables by selling asset-backed securities to investors. The SPVs then service the asset-backed securities using cash flows generated by collecting the receivables.

AmeriCredit realizes a gain on receivable sales to the SPVs, measured by the difference between the sale proceeds paid to AmeriCredit and AmeriCredit's net carrying value of the receivables, plus the present value of any excess cash flows AmeriCredit expects to receive during the life of the securitization.[2] By using this

2. Excess cash flows result from the difference between the interest received from the obli-

type of asset securitization, an originator—in this case, AmeriCredit—can access capital by issuing debt that is not reflected on its balance sheets. Investors also benefit from this financing structure because debt issued by the SPVs is serviced by cash flows from the receivables. If the SPVs are bankruptcy remote from the originator, the debt will not carry the risk of delayed payment or default that may be associated with debt issued from a leveraged originator. Therefore, investors are willing to pay more for the less risky securities, which translates into a lower cost of capital for the originator.

To reduce further the risk of debt securities issued by the SPVs, AmeriCredit provides a credit enhancement either in the form of a cash reserve account or a subordinated interest. In this way, AmeriCredit confers on investors an added source of recourse—similar to overcollateralization of a secured loan—if transferred receivables do not generate anticipated income. When certain performance conditions are met, cash reserves are released back to AmeriCredit.

Cash reserves are accounted for in financial statements using either the cash-in or cash-out method. The cash-in method assumes the cash reserves of SPVs are available to the originator when the cash is deposited in the reserve account. This method does not discount the value of cash reserves to account for the restricted nature of the asset. The cash-out method values the cash held in cash reserves based on the expected date when the cash will become available. The cash-out method does discount the value of cash reserves to account for the restricted nature of the asset.

Before 1998 the sole guidance for credit enhancement accounting that the SEC provided was that it comply with Generally Accepted Accounting Principles ("GAAP"). GAAP's only direction consisted of FASB No. 125, which was adopted in June 1996 and took effect as of December 31, 1996.

FASB No. 125 provided that securitized assets were to be accounted for based on an estimate of fair value. It did not explicitly address credit enhancements or the cash-in or cash-out methods of accounting. In December 1998 the SEC clarified the standard as it pertained to credit enhancements by recognizing the cash-out method of accounting as preferable and stating the cash-in method was no longer acceptable. Following the SEC's clarification, AmeriCredit revised its financial statements for the second, third, and fourth quarters of fiscal 1997, all quarters of fiscal 1998, and the first quarter of fiscal 1999 to reflect the mandated change in accounting methods. The revised statements showed decreased net incomes of 23% in 1997 and 20% in 1998. Following the announcement of the changes, AmeriCredit's stock value dropped from $15¼ per share the day before the announcement to $12¾ per share two trading days thereafter. Before revealing the changes in income, AmeriCredit was issuing senior unsecured notes at a rate of 9¼%. After the changes, the prevailing rate for similar notes rose to 9⅞%.

In 1997 AmeriCredit implemented a credit scoring system throughout its branch office network to improve the branch level credit approval process. The credit scoring system sought to measure the reliability of AmeriCredit's receivables from loan purchases. AmeriCredit used the data gathered in the credit scoring system to produce a credit scorecard. The credit scorecard was validated monthly by comparing actual versus projected loan performance by score. AmeriCredit's results of operations, financial condition, and liquidity materially depended on the credit performance of the loans purchased and held by AmeriCredit before being securitized, and also on the subsequent performance of receivables sold to securitization trusts. If the losses from defaulted loans exceeded the loss allowance set aside by AmeriCredit, it would then have to recog-

gors on the receivables and the interest paid by the SPVs on the asset-backed securities.

nize the excess losses as an expense on its balance sheet. In addition, AmeriCredit's credit agreements precluded borrowing against defaulted loans and loans more than 30 days delinquent.

Rather than automatically consider a loan to be in default after missed payments, AmeriCredit maintained a policy by which

> [p]ayment deferrals are at times offered to customers who have encountered temporary financial difficulty, hindering their ability to pay as contracted, and when other methods of assisting the customer in meeting the contract terms and conditions have been exhausted. A deferral allows the customer to move a delinquent payment to the end of the loan by paying a fee.... The collector must review the past payment history and assess the customer's desire and capacity to make future payments and, before agreeing to a deferral, must comply with the Company's policies and guidelines for deferrals. Exceptions to the Company's policies and guidelines for deferrals must be approved by a collections officer.

Ds. Mem. at 14–15 (emphasis deleted) (quoting AmeriCredit's Fiscal 1997 SEC Form 10–K at 10–11) (noting exclusion of last sentence in plaintiffs' amended complaint). AmeriCredit publicly stated in SEC filings that loan deferrals were granted to customers in accordance with this policy. AmeriCredit monitored its loan receivables by preparing a Daily Report for review by all collection supervisors, collection site managers, and AmeriCredit executives. Each collections department group was expected to attain monthly deferral goals. Supervisors of groups that did not

attain deferral goals received negative performance evaluations. As a result, deferrals were regularly granted that were not in accordance with stated policies and, in the second quarter of fiscal 1999, AmeriCredit was forced to include a $3.6 million reserve for fiscal 1996 loan portfolios. This reserve reduced earnings in the second quarter of fiscal 1999 by $0.03 per share (more than 10%) to $0.26 per share and caused AmeriCredit to miss the consensus of analyst estimates for that quarter.

Plaintiffs purchased or otherwise acquired shares of AmeriCredit common stock between January 15, 1997 and January 13, 1999.[3] They sue defendants AmeriCredit, Clifton H. Morris, Jr.,[4] Daniel E. Berce,[5] and Michael R. Barrington,[6] alleging that AmeriCredit committed securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5 (1999). Plaintiffs also contend that defendants Morris, Berce, and Barrington ("Individual Defendants") are individually liable as controlling persons pursuant to § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).[7]

Defendants moved to dismiss plaintiffs' original complaint based on their failure adequately to plead scienter. On December 22, 1999 the court granted the motion, but allowed plaintiffs to file an amended complaint. Plaintiffs have filed their amended complaint and defendants move anew to dismiss.

## II

■ "The PSLRA obligates a plaintiff to 'state with particularity facts giving rise

---

3. The court on August 9, 1999 appointed John Mortensen and Philip Katz as lead plaintiffs.

4. Chairman of the Board of Directors and Chief Executive Officer of AmeriCredit since 1988.

5. Vice Chairman and Chief Financial Officer of AmeriCredit since 1996 and a Director of AmeriCredit since 1990.

6. Vice Chairman, President, and Chief Operating Officer of AmeriCredit since 1996 and a Director of AmeriCredit since 1990.

7. During the class period, the Individual Defendants collectively owned 8% of AmeriCredit's outstanding stock.

to a strong inference that the defendant acted with the required state of mind.'" *Coates v. Heartland Wireless Communications, Inc.,* 55 F.Supp.2d 628, 634 (N.D.Tex.1999) (Fitzwater, J.) ("*Coates II*") (quoting 15 U.S.C. § 78u–4(b)(2)). "To plead scienter in conformity with Rule 9(b), a plaintiff 'must set forth specific facts to support an inference of fraud.'" *Id.* (quoting *Lovelace v. Software Spectrum Inc.,* 78 F.3d 1015, 1018 (5th Cir. 1996)). It is inadequate to aver generally the defendant's knowledge of material falsity unless specific facts are set forth that make it reasonable to believe the defendant knew the statement was false or misleading. *Maldonado v. Dominguez,* 137 F.3d 1, 9 (1st Cir.1998); *Coates II,* 55 F.Supp.2d at 634. Boilerplate or conclusory allegations are insufficient. *Coates II,* 55 F.Supp.2d at 634 (collecting cases). "The PSLRA pleading standard ... requires that the specific facts alleged in the complaint must give rise to a *strong inference* of fraudulent intent." *Id.* (citing 15 U.S.C. § 78u–4(b)(2); *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1418 (3d Cir.1997); *Suna v. Bailey Corp.,* 107 F.3d 64, 68 (1st Cir.1997); *Chill v. General Elec. Co.,* 101 F.3d 263, 267 (2d Cir.1996)). A plaintiff may meet his pleading obligation based on conscious behavior, *id.* at 635, severe recklessness, *id.* at 640, or motive and opportunity, *id.* at 642. When a complaint fails to plead scienter in conformity with the PSLRA, dismissal is required. *Id.* at 634 (citing *Lirette v. Shiva Corp.,* 27 F.Supp.2d 268, 275 (D.Mass. 1998)); 15 U.S.C. § 78u–4(b)(3)(A).

### III

The court considers first whether plaintiffs have adequately pleaded scienter based on motive to commit securities fraud.

### A

Plaintiffs allege motive as follows:

AmeriCredit sold $125 million of 9¼% Senior Notes (due 2004), to certain institutional buyers in February 1997. The artificially inflated financial results AmeriCredit reported during the Class Period enabled AmeriCredit to issue the Senior Notes on more favorable terms to itself. In addition, the Company admitted in its 1997 10–K that "the Company is not able to borrow against defaulted loans and loans greater than 30 days delinquent held by the Company." The manipulation of the delinquency rate, in addition to giving the false impression that the Company's loans were more secure than they were, allowed the Company to borrow against the loans that had been deferred, instead of being declared delinquent. Under the Company's Restated Revolving Credit Agreement, the lenders would not have to loan AmeriCredit funds pursuant to the agreement if the ratio of the net amount of delinquent loans plus the net amount of repossessed loans, divided by the net amount of indirect loans, exceeded 7.5%.

Am. Compl. ¶ 77.

■ "To plead motive, a plaintiff must aver with particularity the concrete benefits that could be recognized by a statement or omission." *Coates II,* 55 F.Supp.2d at 642 (citing *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1130 (2d Cir.1994)).[8] A generalized motive "which could be imputed to any publicly-owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter." *Chill,* 101 F.3d at 268. "[A]ssertions that would almost universally be true, such as the desire to raise capital, or successfully to bring a public offering to fruition, economic self-interest, and the desire to maintain good relationships with suppliers, encourage retailers, forestall lenders, and protect one's executive position, are inadequate of themselves to plead motive." *Coates II,* 55 F.Supp.2d at 644 (citations

---

8. "To plead opportunity, a plaintiff must allege specific facts that set out the means and likely prospect of achieving concrete benefits by the means alleged." *Id.*

omitted) (holding that plaintiffs failed to set out sufficient facts for inference of fraud where alleged motive was to inflate stock price to complete successfully two public offerings); *accord In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 988 (9th Cir.1999) (holding that plaintiff failed adequately to plead scienter where complaint made generalized allegations that officers stated publicly that company would succeed, then sold personal shares at considerable profit, and, shortly thereafter, company's success diminished).

## B

■ The court dismissed plaintiffs' original complaint because their allegation of motive based on inflated financial results was inadequate. *See* Dec. 22, 1999 order at 2–3. Plaintiffs do not cite any new facts in their amended complaint that cure this defect. *Cf.* Ps. Mem. at 16–18. Instead, they argue that their alleged motive—obtaining debt on more favorable terms—is sufficient of itself. The court has previously rejected this argument as an unsupported, generalized allegation of motive that is insufficient as a matter of law. *See* Dec. 22, 1999 order at 2–3 (citing *Coates v. Heartland Wireless Communications, Inc.,* 26 F.Supp.2d 910, 919 (N.D.Tex.1998) (Fitzwater, J.) ("*Coates I* ")). Plaintiffs have failed to plead scienter based on a motive to commit securities fraud.

## C

■ In their amended complaint, plaintiffs plead motive on a new basis: manipulation of loan delinquency rate. They base this theory of scienter on the following allegations:

> As reflected in the Daily Report, AmeriCredit had up to the minute knowledge about the overall status of AmeriCredit's accounts receivables. This information was available on a Company-wide basis. With this information, at any point during the month, the Company was able to assess how many accounts were about to become delinquent and take the neces-
> sary step to avoid booking too many delinquencies which would trigger defaults under its financing agreements with its own lending institutions. Thus each day, the Company, in the Daily Report, established goals for the collection department to meet in the area of delinquencies, loan payment deferrals, and vehicle repossessions. These goals would change daily depending on the number of delinquencies reported. If too many delinquencies were reported, this number would be manipulated by increasing the loan deferrals goals, which would have the effect of lowering the number of delinquencies and repossessions to the desired goal.

Am. Compl. ¶ 63.

> By thus manipulating loan payment deferrals and vehicle repossessions, the Company was able to manipulate the loan delinquencies reported, for, by permitting a customer to defer loan payments, the Company avoided reporting an account delinquency. It thereby avoided triggering defaults under the credit and securitization agreements, which would have the effect of freezing the Company's access to the excess servicing receivable.

*Id.* ¶ 65. Defendants maintain that these allegations are too vague because plaintiffs have failed to identify any loans that AmeriCredit improperly treated as deferred instead of delinquent. *See* Ds. Mem. at 12. They also contend that plaintiffs have not alleged that AmeriCredit borrowed against loans that should have been categorized as delinquent, or˙ that AmeriCredit needed the increased borrowing capacity. *See id.*

Although plaintiffs propose a scheme by which AmeriCredit *could* have committed fraud, they have failed to plead specific facts that give rise to a strong inference that AmeriCredit actually did so. *See Coates II,* 55 F.Supp.2d at 642. Therefore, the court dismisses the claim as an

unsupported, generalized allegation of motive that is insufficient as a matter of law.[9]

## IV

The court considers next whether plaintiffs have adequately pleaded scienter based on conscious behavior or severe recklessness.

### A

■ "[A] plaintiff can plead scienter 'by identifying circumstances that indicate conscious behavior on the part of the defendant, though the strength of the circumstantial allegations must be correspondingly greater.'" *Id.* at 635 (quoting *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir.1994)). "Conscious behavior is a 'more stringent standard.'" *Id.* (quoting *Lovelace*, 78 F.3d at 1019 n. 3). "Conscious behavior, of course, means conscious *mis*behavior." *Id.* (citing *Burlington*, 114 F.3d at 1418). "To allege scienter based on conscious conduct, a plaintiff must plead strong circumstantial evidence of misbehavior." *Id.* at 638 (citing *Burlington*, 114 F.3d at 1418).

■ Severe recklessness "is 'limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 521 (5th Cir.1993) (quoting *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961–62 (5th Cir.1981) (en banc)). "A defendant's omissions or misrepresentations are severely reckless only if they (1) involve an extreme departure from the standards of ordinary care, and (2) present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have

been aware of it." *Lovelace*, 78 F.3d at 1018 n. 2. "The facts alleged to support recklessness must be 'strong circumstantial evidence' of that recklessness" and "must, in fact, approximate an actual intent to aid in the fraud being perpetrated." *Chill*, 101 F.3d at 269 (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995), and *Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 121 (2d Cir.1982)); *see Maldonado*, 137 F.3d at 9 & n. 4 (holding that severe recklessness requires strong inference that defendant knew statement or omission was false or misleading). A plaintiff cannot rely on rote and conclusory allegations that a defendant acted recklessly. *Melder v. Morris*, 27 F.3d 1097, 1103–04 (5th Cir.1994).

### B

■ In the pertinent part of their response to defendants' motion to dismiss, plaintiffs do not cite a single place in their amended complaint that they contend alleges scienter based on conscious behavior or severe recklessness. *See* Ps. Mem. at 9–16. The court dismissed plaintiffs' original complaint because their allegations that AmeriCredit intentionally chose to violate GAAP in order to maximize its earnings failed adequately to plead scienter. *See* Dec. 22, 1999 order at 3–4. The court held that plaintiffs "attempt[ed] to distinguish the usual rule—GAAP violations do not of themselves raise a strong inference of fraud—on the premise that AmeriCredit deliberately chose, with fraudulent intent, to violate GAAP." *Id.* at 3. It concluded that nothing in the complaint provided factual support for

> the conclusory contention that AmeriCredit intentionally or recklessly chose to violate GAAP (as opposed to, for example, making an error in accounting judgment); that it was known by others in the industry that use of the cash-in method violated GAAP; or that AmeriCredit's independent auditor objected to

---

9. Because plaintiffs have failed adequately to plead motive, the court need not address

whether they have sufficiently pleaded opportunity. *See id.* at 642 n. 21.

or even questioned AmeriCredit's use of the cash-in method. *Id.* at 4 (citing *Lovelace,* 78 F.3d at 1020–21 (holding that complaint did not adequately plead scienter despite allegations that defendants published earnings that violated GAAP and defendants changed auditors because they insisted that earnings be restated)). The court noted that "plaintiffs should be able to plead specific facts that show that AmeriCredit and the individual defendants were so out of step with how others in the industry (or similar businesses) reported earnings as to lead to a strong inference of fraud." *Id.* at 5.

Plaintiffs attempt to correct this deficiency by attaching to their amended complaint the declaration of Douglas R. Carmichael, Ph.D., CPA, CFE ("Dr. Carmichael"). Dr. Carmichael's declaration, however, does no more than attempt to establish GAAP violations as *ipso facto* proof of intentional fraud. The declaration states, in relevant part:

> The fact that SFAS No. 125 does not refer explicitly to the cash-in or the cash-out method is not significant. SFAS No. 125 applies to transfers of financial assets generally even though these transfers may take many forms. SFAS No. 125 does not refer explicitly to sales of auto receivables even though there is no dispute that SFAS No. 125 applies to AmeriCredit's sales of auto receivables. In a similar manner, SFAS No. 125 does not refer explicitly to the cash-in or the cash-out methods. However, it requires that all assets obtained and liabilities incurred in a sale of financial assets be initially measured at fair value. SFAS No. 125 also provides guidance on how fair value should be measured. The cash-in method is a valuation technique that is not consistent with the SFAS No. 125 definition of fair value. As the SEC staff has stated, this inconsistency was always clear. It should have been obvious to AmeriCredit that the cash-in method was inconsistent with the requirements of SFAS No. 125 when that statement was adopted effective January 1, 1997. In other words, AmeriCredit had to have known, the cash-in method was a GAAP violation. The subsequent restatement of financial statements is a further indication that the cash-in method should have been recognized as a GAAP violation when the financial statements were initially issued.

Carmichael Decl. at ¶ 14 (emphasis deleted). Even if Dr. Carmichael's expert opinion provides necessary specificity to the allegation that AmeriCredit knowingly violated GAAP, plaintiffs have still failed adequately to plead scienter.

■ "The failure to follow GAAP is, by itself, insufficient to state a securities fraud claim." *In re Comshare, Inc. Sec. Litig.,* 183 F.3d 542, 553 (6th Cir.1999); *see also Stevelman v. Alias Research Inc.,* 174 F.3d 79, 84 (2d Cir.1999) ("[Pleading only GAAP violations] may not, in itself, be sufficient: 'Allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim.'" (quoting *Chill,* 101 F.3d at 270)); *Lovelace,* 78 F.3d at 1020 (holding that failure to follow GAAP, without more, is not sufficient to establish scienter); *accord Coates II,* 55 F.Supp.2d at 636 ("Even had plaintiffs asserted that the policy violated industry standards, such violations would alone be insufficient without corresponding fraudulent intent."); *Coates I,* 26 F.Supp.2d at 921 ("Identifying an industry practice, without more, is insufficient to plead scienter."); *see Fine v. American Solar King Corp.,* 919 F.2d 290, 297 (5th Cir.1990) ("We agree that the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter. The party must know that it is publishing materially false information, or the party must be severely reckless in publishing such information."). Plaintiffs have not alleged knowing or severely reckless publishing of materially false information, either directly

by specific factual allegations or indirectly by showing industry practice or an independent auditor's opinion rejecting the cash-in method. Therefore, plaintiffs have insufficiently pleaded scienter based on conscious behavior or severe recklessness with respect to AmeriCredit's non-compliance with GAAP.

Plaintiffs also rely on the remarks of Robert Uhl ("Uhl"), Professional Accounting Fellow at the SEC, but his statements simply corroborate that the proper application of FASB No. 125 was unclear before the SEC clarified the matter. *See* Ps. Mem., Ex. 1 at 2 ("The staff has been asked whether both methods, cash-in and cash-out, provide acceptable estimates of fair value. The staff has concluded that the cash-out method and not the cash-in method is consistent with the definition of fair value."). Uhl's remarks also undercut Dr. Carmichael's expert opinion. If FASB No. 125 was as clear as Dr. Carmichael opines, the SEC would not have needed to clarify how the standard was to be applied. Moreover, in January 1999, following Uhl's statement, AmeriCredit promptly complied with the SEC's clarification of FASB No. 125 by restating its earnings. Therefore, plaintiffs' allegations concerning AmeriCredit's violations of GAAP do not sufficiently demonstrate conscious misbehavior or severe recklessness as to give rise to a strong inference of fraud.

### C

█ Plaintiffs also attempt to plead scienter under a conscious behavior or severe recklessness standard based on AmeriCredit's manipulation of loan delinquency rates. Defendants maintain that plaintiffs have failed to state with particularity the facts concerning loan delinquency rates that give rise to a strong inference of fraud. *See* Ds. Mem. at 14. Plaintiffs have not responded specifically to this argument.

If plaintiffs intend to plead scienter on this basis, they do so in the following part of their amended complaint:

The Daily Report was distributed throughout the Company, including to Defendant Morris. Defendants intentionally manipulated the delinquency rate by granting deferrals which were not in accordance with stated Company guidelines and which were made without the customer's knowledge and by manipulating the reporting of vehicle repossessions.

Am. Compl. ¶ 76. Plaintiffs have failed, however, to allege a specific instance or strong circumstantial evidence that AmeriCredit granted a deferral that did not comply with AmeriCredit's stated guidelines. This renders their amended complaint deficient. *See Coates II*, 55 F.Supp.2d at 638 ("To allege scienter based on conscious conduct, a plaintiff must plead strong circumstantial evidence of misbehavior."). Plaintiffs' rote and conclusory allegations that AmeriCredit acted with conscious or reckless intent are insufficient to plead scienter. *See Melder*, 27 F.3d at 1103–04.

### V

█ Defendants also move to dismiss on the ground that plaintiffs have failed adequately to plead that the Individual Defendants acted with scienter. The court previously dismissed plaintiffs' claims with respect to the Individual Defendants on the following reasoning:

Although plaintiffs respond with a captain of the ship metaphor, they do not demonstrate how their complaint adequately pleads the scienter of each individual defendant (apart from their liability as controlling persons under § 20(a) of the Exchange Act). Instead, plaintiffs appear to rely generally on these defendants' signatures on financial reports and their positions with AmeriCredit. The assertion that these defendants acted with scienter because they intentionally chose and/or approved AmeriCredit's use of the cash-in method is also insufficient for the reasons explained above.

Dec. 22, 1999 order at 5 (citation omitted). Plaintiffs have not attempted to correct this pleading deficiency in their amended complaint. Moreover, plaintiffs' opposition memorandum drops the "captain of the ship" metaphor of their prior opposition memorandum, but otherwise follows the memorandum *in haec verba*. *See* Ps. Mem. at 20–22. Therefore, plaintiffs' amended complaint is deficient as to the Individual Defendants for the same reasons that the complaint was defective.

Plaintiffs also seek to hold the Individual Defendants liable pursuant to § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as controlling persons. Because the court has dismissed the underlying securities law claims, the court holds that the Individual Defendants are not liable as controlling persons. *See Coates II*, 55 F.Supp.2d at 645.

## VI

Plaintiffs argue that if the court grants defendants' motion, it should permit them to replead. *See* Ps. Mem. at 25 n. 11. The court declines to do so where, as here, plaintiffs have failed adequately to plead scienter after the court has already granted one motion to dismiss based on insufficient allegations of scienter and has given plaintiffs a second opportunity to plead scienter in the manner required by law.

\* \* \* \* \* \*

The court grants defendants' motion to dismiss and dismisses this action with prejudice by judgment filed today.

**SO ORDERED.**